### YOUR ICE CO. v. UNITED STATES.
### Civil Action No. 373.

District Court, M. D. Tennessee, Nashville Division.

Nov. 24, 1944.

Lee Douglas, of Nashville, Tenn., for plaintiff.

A. O. Denning, Asst. U. S. Atty., of Nashville, Tenn., for defendant.

DAVIES, District Judge.

The cause was submitted upon the pleadings, evidence, exhibits, and argument of counsel for plaintiff and defendant, and, after due consideration thereof, the Court enters its findings of fact and conclusions of law, as follows:

## Findings of Fact

1. The plaintiff is a corporation duly organized and existing under the laws of the State of Tennessee, and doing business with its principal office at Nashville, Davidson County, Tennessee.

2. The plaintiff timely filed an Employer's Tax Return under Title VIII of the Social Security Act, 42 U.S.C.A. § 1001 et seq., for January 1, 1937, through December 31, 1938, and under the Federal Insurance Contributions Act, 26 U.S.C.A. Int. Rev.Code § 1400 et seq., for 1939, 1940, and 1941, and paid the tax shown thereon.

3. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $681.46, representing taxes under Title VIII of the Social Security Act and the Federal Contributions Act for the taxable period of January 1, 1937, through June 30, 1941, which sum was paid to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

4. The plaintiff filed a claim for refund of the said tax of $681.46 with the Collector of Internal Revenue on September 20, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

5. The Commissioner of Internal Revenue denied the plaintiff's claim for refund of the said tax of $681.46 on April 30, 1942, and duly notified the plaintiff in writing of such action.

6. The plaintiff timely filed a return under Title VIII of the Social Security Act for the period of January 1, 1936, through December 31, 1936, and paid the tax shown thereon.

7. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $110.33 for the period from January 1, 1936, through December 31, 1936, representing tax under Title IX of the Social Security Act, 42 U.S.C.A. § 1101 et seq., which sum was paid by the plaintiff to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

8. The plaintiff filed a claim for refund of the said tax of $110.33 with the Collector of Internal Revenue on September 23, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

9. The Commissioner of Internal Revenue denied plaintiff's claim for refund of the said tax of $110.33 on November 1, 1941, and duly notified the plaintiff in writing of such action.

10. The plaintiff timely filed a return under Title IX of the Social Security Act for the period from January 1, 1937, through December 31, 1937, and paid the tax shown thereon.

11. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $191.33 for the period from January 1, 1937, through December 31, 1937, representing tax under Title IX of the Social Security Act, which sum the plaintiff paid to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

12. The plaintiff filed a claim for refund of the said tax of $191.33 with the Collector of Internal Revenue on September 23, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

13. The Commissioner of Internal Revenue denied the plaintiff's claim for refund of the said tax of $191.33 on November 1, 1941, and duly notified the plaintiff in writing of such action.

14. The plaintiff timely filed a return under Title IX of the Social Security Act for the period from January 1, 1938, through December 31, 1938, and paid the tax shown thereon.

15. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $259.71 for the period from January 1, 1938, through December 31, 1938, representing

tax under Title IX of the Social Security Act, which sum the plaintiff paid to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

16. The plaintiff filed a claim for refund of the said tax of $259.71 with the Collector of Internal Revenue on September 23, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

17. The Commissioner of Internal Revenue denied the plaintiff's claim for refund of the said tax of $259.71 on November 1, 1941, and duly notified the plaintiff in writing of such action.

18. The plaintiff timely filed a tax return under the Federal Unemployment Tax Act for the period from January 1, 1939, through December 31, 1939, and paid the tax shown thereon.

19. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $187.44 for the period from January 1, 1939, through December 31, 1939, representing Federal Unemployment Tax, which sum the plaintiff paid to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

20. The plaintiff filed a claim for refund of the said tax of $187.44 with the Collector of Internal Revenue on September 23, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

21. The Commissioner of Internal Revenue denied the plaintiff's claim for refund of the said tax of $187.44 on November 1, 1941, and duly notified the plaintiff in writing of such action.

22. The plaintiff timely filed a tax return under the Federal Unemployment Tax Act for the period from January 1, 1940, through December 31, 1940, and paid the tax shown thereon.

23. Thereafter, the Commissioner of Internal Revenue assessed an additional tax against the plaintiff in the sum of $194.52 for the period from January 1, 1940, through December 31, 1940, representing tax under the Federal Unemployment Act, which sum the plaintiff paid to Lipe Henslee, then Collector of Internal Revenue for the District of Tennessee, on September 17, 1941.

24. The plaintiff filed a claim for refund of the said tax of $194.32 with the Collector of Internal Revenue on September 23, 1941, and said claim was duly forwarded to the Commissioner of Internal Revenue.

25. The Commissioner of Internal Revenue denied the plaintiff's claim for refund of the said tax of $194.32 on November 1, 1941, and duly notified the plaintiff in writing of such action.

26. The grounds for the claims for refund of said taxes were, as stated in the claim, that the individuals with respect to whom the taxes were assessed and paid were not employees of the plaintiff but, on the other hand, such individuals described as operators of ice and merchandise stores in Charleston, South Carolina, were independent contractors, and the others, that is, the men working for them, were their employees, and hence none of the individuals were employees of the plaintiff.

27. The plaintiff is a closed corporation. It was organized by Mr. John B. Howe, a resident of Nashville, Tennessee, and in 1930 it constructed an ice plant in Charleston, South Carolina, where its business has since been conducted. Mr. Howe was the owner and president of the corporation and was in active control of its affairs until his death in July 1937. Since that time his daughter, Miss Elizabeth P. Howe, who became a director in 1936, has been its president.

28. At the time of the establishment of the plaintiff's business, there were already two ice manufacturing plants located in Charleston, and at the outset the plaintiff was met by sharp competition in the sale of ice. In order to facilitate its business, the plaintiff established in various neighborhoods in Charleston outside stations (sometimes referred to as "boxes") where platform sales of its ice were made. There were four such stations in 1930, and by 1933 the number had increased to seven. The stations were located on premises which were owned or held under lease by the plaintiff, and each station was operated by an individual known as a station agent.

29. The ice business is seasonal, and in the beginning of plaintiff's business the people of Charleston used very little ice in the winter. Eighty per cent of the plaintiff's customers were colored people, and when it got cold they stopped buying ice. So, in order to justify keeping the stations open during the winter, it was necessary for the plaintiff to keep other commodities for sale at its several stations, which was done commencing shortly after the plaintiff

started making and selling ice. These commodities consisted of groceries, coal, charcoal, kindling, kerosene, watermelons, soft drinks, etc., which where bought at wholesale by the plaintiff and furnished to the station agents for sale. The plaintiff's principal business was, however, the manufacture and retail sale of ice, and the sale by it of said commodities was merely a sideline or drawing card for the ice business.

30. In order to keep track of the profit or loss resulting from its dealings in the commodities, other than ice, sold at its stations, there was set up within the corporation in 1930 a department known as Your Merchandise Company. A bank account in the name of Your Merchandise Company was maintained with a bank in Charleston which was used as a depository of funds involved in the transactions relating to the purchase and sale of said commodities, and a set of books was kept of the transactions the same as if the plaintiff and Your Merchandise Company were separate entities. From time to time the plaintiff made deposits of money in said bank to the credit of Your Merchandise Company which were reflected on the plaintiff's books as accounts receivable in its favor and as charges against the Company. Such money was paid out for the purchase of the commodities handled by the several stations, for bonuses to the station agents, for rent, and for other expenses incident to the business, and was replenished by daily deposits of funds derived from the sale of said commodities which were reflected on the plaintiff's books as a credit in favor of Your Merchandise Company.

31. The station agents all were, prior to December 31, 1933, employees of the plaintiff; and each agent was paid by the plaintiff for his services a wage of $17.50 per week, plus a bonus of 10% of the gross sales price of the merchandise sold by him. Prior to January 1, 1934, the men in charge of these stations were Frank Schuler, Charles Lominac, M. P. Seabrook, M. A. Walsh, H. A. Vonderleith, E. J. Bee, and H. W. Estes. Walsh and Estes are dead. Lominac and Seabrook are in the Marines.

32. The plaintiff also had in its employ one Alex Garland, who became manager of the plaintiff's business in 1930, and who has served in that capacity for the plaintiff to the present time. He has, throughout this period, exercised immediate and direct supervision and control of the plaintiff's business in Charleston.

33. As stated, the relationship between the plaintiff and its seven named station agents was, prior to January 1, 1934, that of employer and employee. But the plaintiff claims that there was a change in the relationship on January 1, 1934, when, as it insists, the station agents became and remained throughout the tax periods in question independent contractors or owners of the business conducted by them. In support of this contention the plaintiff relies heavily upon the following:

(a) Under date of January 2, 1934, the plaintiff executed to Frank Schuler, one of its station agents, an instrument purporting to be a lease to him of the premises whereon was located the station which he was then operating, and under the same date the plaintiff also executed an instrument purporting to be a bill of sale to him of the stock of ice and merchandise then on hand in said station; and under the same date separate similar instruments were executed to each of the six other station agents.

The Schuler lease is on file in the record as Plaintiff's Exhibit No. 1 to his testimony, and his bill of sale is on file in the record as Plaintiff's Exhibit No. 2 to his testimony. The leases and bills of sale to the six other station agents were exactly the same in terms as those to Schuler, the only difference being as to the name of the particular individual, the description of the premises on which the station he was operating was located, and the monthly rental to be paid for the premises.

(b) Your Merchandise Company, according to the plaintiff's books, ceased to exist on December 31, 1933, on which date the charge against it in the same amount was transferred on the plaintiff's books as a charge against Your Stations Agent. This account consisted of the following items: Cash in bank, $642.20; petty cash, $327.50; and inventory, $2,779.64, making a total of $3,949.34.

(c) The bank account carried in the name of Your Merchandise Company was thereafter carried in the name of Your Stations Agent.

34. The execution of the aforesaid leases and bills of sale, the set-up on the books of the plaintiff of Your Stations Agent in the place of Your Merchandise Company, and the transfer of the bank account from the latter to the former name

resulted from a meeting of Mr. Howe and Mr. Garland with the seven station agents held at the Francis Marion Hotel in Charleston in December, 1933. The meeting was called at the direction of Mr. Howe, who explained to the station agents that the State of South Carolina and the City of Charleston had passed laws levying a graduated assessment against chain stores, and that these laws by their wording appeared to apply to the plaintiff's station, and that he thought it best to make a change in the "set up" of the plaintiff's business. The meeting was very informal and no minutes of the proceedings were kept. It appears, however, that a plan was formulated at the meeting whereby each station agent would become lessee of the particular station operated by him and the owner of the ice and merchandise then on hand in said station, and that the station agents would thereafter vend ice furnished to them by the plaintiff and be associated together under the name of Your Stations Agent, in which name the bank account and bookkeeping records of their transactions with the plaintiff would be kept, and that the said Alex Garland would, as their agent, purchase their merchandise for them and keep a record of their individual accounts. But the Court finds from all of the evidence in the case and especially from the matters appearing in a contract read into the record as Government's Exhibit No. 1, that in reality the change effected among the parties was apparent rather than substantial, so far as the controlling question before the Court is concerned.

35. The contract last above referred to is as follows:

"This contract made and entered into this 23rd day of August, 1934, by and between F. Schuler hereinafter called the owner, party of the First Part and Your Station Agents hereinafter called the Company, party of the Second Part Witnesseth—

"That in 1930 Your Ice Company erected an ice plant in Charleston, S. C. to sell their ice mostly through properly located distributing stations and that they employed Managers at these Stations at 2.50 a day and that they later decided to sell other commodities to enable them to maintain the Stations during the Winter months with experienced operators and also, to retain these Managers without reduction of wages, in fact, they decided on a Bonus System that would enable these managers to earn more than their wages.

"On later dates the State of South Carolina and the City of Charleston, S. C. passed laws graduating the assessments of the Chain Stores and these laws were not intended to cover these operations which would have worked a severe hardship on the owners but from the wording of same they appeared to apply to the Stations so it was necessary for Your Ice Company to discontinue operating these Stations and to lease them to those who were previously the Managers but who then automatically became the Owners of these Stations, but to enable them to purchase the commodities they handled on a competitive basis these Owners organized a Company named Your Stations Agent and this Company was to do the purchasing of these commodities, distribution of same and accounting and they agreed that all sales other than ice at the Stations, also at the Plant Platforms a compensation of 5% of the total sales was to be paid to Your Ice Company for this cost of distribution.

"Furthermore, it became necessary to have funds to operate the Company, and to enable them to carry on; so they entered into agreement with Your Ice Company accepting the inventory of merchandise they had on hand at a reduced price amounting to 3109.47 and also accepting the balance of the Merchandising Bank Account amounting to $1043.89 and their Petty Cash Fund amounting to 327.50 or a total of 4480.86, same to be repaid with Annual Interest at the rate of 6%.

"This Company and the Owners further agreed that Your Ice Company was to have full control of the operations of the Company and the Owners until this loan and interests were fully paid and that there was to be applied to the reduction of this loan an amount equal to any distribution of Profits to Owners, Officers, etc.

"Owners further agreed that when the Company considered it advisable to remove an Owner, the lease that he possessed would immediately be surrendered to the Company and all necessary adjustments for his removal would not be contested and furthermore that he would accept an amount that would equal twelve months earnings less all previous payments, same to be the previous twelve months, and inventory adjustments as a final settlement.

"The Owners all agree that any distribution of Profits shall be made on the Basis that first one half of the total distribution shall apply to reducing the loan of Your

Ice Company, together with interests, that one fourth of this distribution shall be equally divided amongst the Owners and that one fourth shall go to the Officers of the Company, etc.

"That to continue as Owner it will be necessary to give satisfactory service to the Company and that the Company also has the rights to make any other conditions or changes that they think advisable.

"That after the loans and the interest that are due Your Ice Company are fully paid that the Owners and the Officials of the Company are to operate the business, including the election of the Directors and the Officers of the Company and I would suggest that the Board of Directors be composed of five members and that each Owner and each Official of the Company be entitled to one vote in the selection of this Board of Directors.

"Your Stations Agent
"By   Alex Garland
"Frank Schuler
"Owner

"Witness
"C. H. Stevens
"Witness
"Frank N. Boensch"

36. The foregoing contract was duly executed by the station agent Frank Schuler and by plaintiff's manager, Alex Garland. A separate contract in the exact terms of the above was executed by each of the other six station agents and the said Garland, on the same date. These contracts were prepared by Mr. John B. Howe, acting as president of the plaintiff corporation. They were made primarily for the benefit of the plaintiff, and were intended as a repository of the agreement and understanding between the plaintiff and the station agents and the reason for the apparent change in the set up of the plaintiff's business.

37. The business was carried on after January 1, 1934, in all substantial respects the same as it was prior to that date. Both before and after January 1, 1934, the business conducted by the station agents was under the direct supervision of plaintiff's manager, Alex Garland. In the afternoon of every business day he called at each of the stations and collected from each station agent the money taken in by him from the sales of ice and merchandise. Of the funds thus collected, prior to said date, he deposited in the bank to the credit of Your Merchandise Company the amount representing the sales price of the merchandise, and sent to plaintiff's secretary-treasurer at Nashville, Tennessee, a statement of the deposit as information to him for making the proper bookkeeping entries. The same procedure was followed with respect to the funds collected after that date, except that the money derived from the sales price of the merchandise was deposited to the credit of Your Station Agents. The station agents were men of experience and each was acquainted with the needs of his particular station, and so when Mr. Garland called upon him each day he ordered such quantity of ice and the various items of merchandise as the next day's business required. At the direction of Mr. Garland, the ice was delivered to the agents by the plaintiff from its manufacturing plant and the merchandise, from its warehouse, prior to said date, after which time the merchandise was bought at wholesale by Mr. Garland and delivered either by the plaintiff or the wholesaler direct. All sales of both ice and merchandise were for cash. After January 1, 1934, the station agents continued to perform for the plaintiff services that were necessary for the conduct of the plaintiff's principal business, that is, of selling the ice manufactured by it. The station agents continued to receive the same basic wage for their services as they had prior to January 1, 1934, and each was paid such stipulated wage irrespective of the profit or loss resulting from the business conducted by him. Each continued to receive, in addition to the stipulated weekly wage, a bonus in the same amount as he had previously received on the retail sales price of the merchandise handled by him, and this, also, irrespective of profit or loss resulting from the business conducted by him. The only change in the remuneration which either station agent was to receive, or did receive, from the business conducted by him was that after January 1, 1934, he should receive, in addition to the salary and bonus previously fixed, any profit derived from the merchandise sold by him. This change in compensation is an immaterial fact in its bearing upon the relationship of the parties, because it is evident from the proof that such additional compensation was provided by the plaintiff as an inducement to the station agents to exercise greater diligence in the prosecution of the plaintiff's business, and by "plaintiff's business" is meant not only the sale of ice but the sale of merchandise, also. The plaintiff received the entire pro-

ceeds from the sale of the ice and 5% of the gross sales price of the merchandise.

38. Your Stations Agent, which the plaintiff claims was an association composed of the station agents, was not a corporation or a partnership, and was not intended by the parties to be either. It was not an entity separate from the plaintiff. It was nothing more than a department of the plaintiff. It was conceived and intended by the parties to serve, and it did serve, precisely the same function as was served by Your Merchandise Company prior to January 1, 1934.

39. Each of the station agents became lessee of the station operated by him, apparently more than in reality. Each lease contained the provisions that the premises so let were to be used "for storage and sale of groceries, ice, coal and other merchandise * * *" and "that neither the said premises or any part thereof shall be assigned, let or underlet; or used or permitted to be used for any purpose other than above mentioned." In this connection, the Court finds as fact that it was intended by the parties that each of the leases should be conditioned by the applicable terms of the contract set out in Paragraph 35 of these Findings. And accordingly, the Court further finds that in order for a station agent to continue his relationship with the plaintiff, it was necessary for him to give satisfactory service to the plaintiff, and he could be removed from the premises at any time the plaintiff considered it advisable to remove him, and that all necessary adjustments for his removal would not be contested. The obligation of the station agents to pay rent and to pay for lights and other incidentals was more or less a fiction. They, in fact, paid for none of these things, and it was never the intention of the parties that they should be obligated personally to make such payments. The stipulated rent and the other expenses were intended by the parties to be and were in fact absorbed from the profits derived from the sale of the merchandise handled by the station agents.

40. The station agents were the owners in name only of the merchandise intended to be covered by the bills of sale to them and of the merchandise thereafter furnished to them by the plaintiff. The same is true with respect to any interest in the cash in bank in the name of Your Merchandise Company, and on hand as petty cash on December 31, 1933, which was thereafter transferred to Your Ice Company and used in the business. The station agents were not financially able to purchase the merchandise called for in the bills of sale, although the same was of small value, nor did they have any funds to purchase such merchandise in the future. They paid nothing to become owners of anything, and executed no evidence of indebtedness, save the contract hereinbefore set out. The amounts representing the merchandise, the bank account and the petty cash fund set forth in said contract and the amounts thereof shown on the books of the plaintiff do not correspond. But the Court finds this to be immaterial, for it is evident from the proof that if there was ever an intention on the part of the station agents to repay the various sums, or any intention on the part of the plaintiff to enforce the payment thereof, such intention has long since been abandoned. No offer on the part of the station agents to pay, nor any demand by the plaintiff for payment of the indebtedness was ever made, and hence, the Court concludes and finds that such indebtedness was to be absorbed from the profits derived from the sale of the merchandise, or else be forgiven and forgotten entirely.

41. Both before January 1, 1934, and at all times during the tax periods in question, the plaintiff had the right of control over the station agents, both as to the manner of doing the work entrusted to them and as to the results to be accomplished. But there was little need for the exercise of such control. This was so because of the nature of the work. Not much business acumen or experience was required to sell, to customers who called at the stations to buy, small quantities of ice and merchandise. However, the plaintiff did require the station agents to handle exclusively ice and merchandise furnished to them by the plaintiff, on penalty of being ousted from their stations, and to sell the ice and merchandise for cash only, at prices fixed by the plaintiff, and to turn over to the plaintiff's manager, daily, the proceeds of each day's sales. The station agents occupied the stations and transacted business there entirely at the will and pleasure of the plaintiff. They were required in all their dealings to give satisfactory service to the plaintiff.

42. The Court has not undertaken to set forth in these Findings all of the facts bearing upon the relationship of the par-

ties, for to do so would be to recite all the evidence. Suffice it to say that the Court is unable to find in the proof any fact or circumstance, when considered in the light of all the other evidence, that would justify the conclusion that there was any substantial change in the relationship between the parties before and after January 1, 1934. Hence, the Court concludes as fact that Your Station Agents during the tax periods in question were engaged in performing work which comprised an integral part of the plaintiff's business.

### Conclusions of Law

1. The station agents, with respect to whom the taxes in question were assessed and collected, were employees of the plaintiff during the tax periods involved in this suit.

2. The taxes sued for were not illegally or wrongfully assessed and collected.

3. The defendant is entitled to judgment in its favor.

Judgment will be entered accordingly.